# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| KELLY SERVICES, INC., | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | CIVIL NO. 08-23-P-H |
| | ) | |
| ERIN E. GREENE, | ) | |
| | ) | |
| DEFENDANT | ) | |

## DECISION AND ORDER ON MOTION FOR PRELIMINARY INJUNCTION

Kelly Services, Inc. ("Kelly Services"), an international staffing agency, is attempting to enforce an employment agreement containing non-compete and confidentiality clauses. This case is presented on Kelly Services' motion for a preliminary injunction against its former employee Erin E. Greene ("Greene"). After analyzing the motion through the familiar four-factor framework, I conclude that Kelly Services falls short of satisfying its burden. The motion for a preliminary injunction is **DENIED**.

### PROCEDURAL BACKGROUND

On January 24, 2008, Kelly Services filed a Verified Complaint[1] claiming this Court's diversity jurisdiction. The Verified Complaint alleges breach of

---

[1] To support or oppose a motion for a preliminary injunction, the parties must present "[e]vidence that goes beyond the unverified allegations of the pleadings . . . ." 11A Charles A. Wright et al., Federal Practice and Procedure § 2949 (1995). This is typically accomplished by submission of affidavits. See id. A verified complaint may be "treated as the functional equivalent of an affidavit." See Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991); Demmons v. Tritch, 484 F. Supp.2d 177, 182–83 (D. Me. 2007).

contract, breach of fiduciary duty, and misappropriation of trade secrets under the Michigan Uniform Trade Secrets Act ("MUTSA").  Verified Compl. ¶¶ 33–56 (Docket Item 1). On that same date, Kelly Services filed a motion for a temporary restraining order and preliminary injunction.  Pl. Kelly Services, Inc.'s Mot. for TRO and Prelim. Inj. (Docket Item 4).  The parties subsequently agreed with the United States Magistrate Judge for the matter to proceed as a motion for preliminary injunction under Fed. R. Civ. P. 65(a) and to be decided on the papers.  (Docket Item 8).

### Factual Background

Kelly Services is a staffing services company incorporated in Delaware, headquartered in Troy, Michigan, and with branches in Maine.  Verified Compl. ¶¶ 2, 6, 8.  It provides a range of employment staffing and consulting services, including outsourcing, recruitment, and temporary staffing.  Id. ¶ 6.  Its "customers" or "clients" are companies with employment needs; and it recruits "candidates" to fill those needs.

Greene is 24 years old.  Aff. of Erin E. Greene, ¶ 1 (Docket Item 11-3), attached to Def. Erin E. Greene's Opp'n to Pl.'s Mot. for TRO and Prelim. Inj. ("Def.'s Opp'n") (Docket Item 11).  She began working for Kelly Services six months after graduating from college.  Id. ¶ 2.  She was employed by Kelly Services for more than two years, from the end of 2005[2] to December 7, 2007, as a "Staffing Supervisor."  Verified Compl. ¶¶ 7–8; Answer and Affirmative

---

[2] The parties disagree whether Greene began work at Kelly Services on November 28, 2005, Verified Compl. ¶ 7, or December 1, 2005, Greene Aff. ¶ 4.  This factual dispute is not material to the pending motion.

2

Defenses of the Def. Erin E. Greene ("Answer") ¶¶ 7–8 (Docket Item 10); Greene Aff. ¶¶ 4, 6, 14.

As a staffing supervisor, Greene serviced and maintained relationships with customers, developed new business, and recruited candidates throughout Cumberland and York Counties in Maine.  Verified Compl. ¶¶ 8, 16; Answer ¶¶ 8, 16.    Greene's responsibilities at Kelly Services involved primarily "recruiting white collar office and clerical workers for customers in the insurance and financial industries, as well as smaller local companies needing office staff."  Greene Aff. ¶¶ 7–9.  Approximately 75 percent of her work with Kelly Services involved recruiting activities for Anthem Blue Cross/Blue Shield, Unum, and Citigroup Financial—including spending one full year on site at Unum.  Id. ¶ 8.   During this time, Greene "acquired intimate knowledge concerning Kelly's employees, employee lists, contact information, and training materials."  Verified Compl. ¶ 18; Answer ¶ 18.

At the beginning of her employment, Greene signed an agreement containing both non-compete and confidentiality clauses.  See Verified Compl., Ex. A.  The pertinent parts of the agreement state:

> (1) Unless required by my job at Kelly, I will never disclose, use, copy, or retain any confidential business information or trade secrets belonging to Kelly, Kelly's customers, or Kelly's suppliers.  This includes customer and employee lists; sales, service, recruiting and training techniques and manuals; sales and marketing strategies; computer programs; financial data and other similar information.

> (2) While I am working for Kelly, I will not solicit any of Kelly's customers or employees for a competing business, and I will not compete against Kelly or associate myself with any Kelly competitor as an employee, owner, partner . . . . These same limitations apply for one year after I leave Kelly

3

in any market area in which I worked or had responsibility during the past five years of my employment with Kelly.

. . . .

(7) This Agreement will be interpreted and enforced under Michigan Law. . . .

Id.

Greene voluntarily resigned from Kelly Services on December 7, 2007. Verified Compl. ¶ 21; Answer ¶ 21; Greene Aff. ¶ 14.  At least part of the reason for her resignation were the repeated statements of possible layoffs made by a supervisor at Kelly Services, Scott Miller.  See Greene Aff. ¶¶ 11–13.  Upon her resignation, Greene informed Kelly Services that she had accepted a job with Maine Staffing Group ("Maine Staffing").  Verified Compl. ¶ 23; Answer ¶ 23; Greene Aff. ¶ 17.[3]

During her employment at Kelly Services, Greene used a variety of proprietary programs and databases that contained confidential information regarding clients, candidates, pricing, and business strategies.  Verified Compl. ¶¶ 14–15; Answer ¶¶ 14–15; Aff. of Scott Miller, ¶ 12 (Docket Item 13-3), attached to Pl.'s Reply Br.  However, when she left Kelly Services, Greene "retained no document, file or other item that would fall into any of the categories of confidential information" as described in the confidentiality agreement.  Greene Aff. ¶ 28.

_____

[3] Some confusion exists regarding exactly what Greene was told at the time of her resignation by Scott Miller, one of her supervisors at Kelly Services, and Dave Roraff, an employee of Kelly Services' department of human resources in Troy, Michigan, about potential problems with her non-compete clause and future employment at Maine Staffing.  Verified Compl. ¶ 23; Answer ¶ 23; Greene Aff. ¶¶ 17–21; Aff. of Dave Roraff, ¶¶ 4–7 (Docket Item 13-2), attached to Pl.'s Reply Br. in Support of Prelim. Inj. ("Pl.'s Reply Br.") (Docket Item 13)  It is not necessary to resolve these factual issues because they are irrelevant to this Decision and Order.

Greene began work for the Portland (Maine) office of Maine Staffing on December 13, 2007, with the title of Staffing Specialist.  Id. ¶ 24; Aff. of Mark Burns, ¶ 4 (Docket Item 11-4), attached to Def.'s Opp'n.  The Portland office of Maine Staffing "recruits blue collar positions for the construction and trade industries"; it "does not recruit for clients seeking to fill office or clerical positions." Burns Aff. ¶ 7.

Greene's duties at Maine Staffing "are primarily clerical in nature." Greene Aff. ¶ 25; Burns Aff. ¶ 5.  While employed at Maine Staffing, Greene does not seek new accounts or customers, Burns Aff. ¶ 6, and she has not solicited any business involving white collar (or clerical) personnel or any Kelly Services customer, Greene Aff. ¶¶ 25–27.  Greene does not perform any work for Maine Staffing that is related to "recruiting for the financial, insurance or health care industries."  Id. ¶ 29.  Greene has not used any protected information from Kelly Services in her position at Maine Staffing.  Id. ¶ 28.

### PRELIMINARY INJUNCTION ANALYSIS

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (quoting 11A Charles A. Wright et al., Federal Practice and Procedure § 2948 (1995)).  As the party requesting the preliminary injunction, Kelly Services must demonstrate each of the following four factors: (1) it will likely succeed on the merits; (2) it will suffer irreparable harm if the injunction is denied; (3) the harm it will suffer outweighs any harm to Greene that would be caused by

injunctive relief; and (4) the effect on the public interest weighs in its favor. See Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006); Gorman v. Coogan, 273 F. Supp.2d 131, 133–34 (D. Me. 2003). The first two factors—likelihood of success on the merits and a cognizable threat of irreparable harm—are "essential prerequisite[s] for issuance of a preliminary injunction." See Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 15 (1st Cir. 2004); Ralph v. Lucent Technologies, Inc., 135 F.3d 166, 170 (1st Cir. 1998).

**(1)   *Likelihood of Success on the Merits***

Kelly Services' motion for a preliminary injunction is premised on its claims for breach of the agreement's non-compete and confidentiality clauses and violation of the MUTSA.[4] Each of these claims must be addressed in determining the likelihood of success on the merits.

The agreement's choice-of-law clause states that Michigan law applies. Greene does not object to the use of Michigan law, either as to interpretation of the contract or as to application of the MUTSA. See Def.'s Opp'n at 8–12. Thus it is not necessary to make any determination on the choice-of-law issues.[5]

---

[4] Although it states a claim for breach of fiduciary duty in its Verified Complaint, Kelly Services does not present this claim in its motion for a preliminary injunction. See Pl. Kelly Services, Inc.'s Mem. of Law in Support of Mot. for TRO and Prelim. Inj. ("Pl.'s Mem.") (Docket Item 4-7).

[5] Kelly Services is headquartered in Michigan, which is most likely a substantial enough relationship to honor the choice-of-law clause. See Schroeder v. Rynel, Ltd., Inc., 720 A.2d 1164, 1166 (Me. 1998). Maine recognizes a contractual choice-of-law provision unless "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) the application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." Id. (quoting Restatement (Second) Conflicts of Law § 187(2) (1971)); see also Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941) (a federal court applies the conflict-of-law rules from the state in which it is located).

*(a) Breach of Non-Compete Clause*

The relevant portion of the non-compete clause applies for one year after Greene left Kelly Services, prohibiting her from associating with any competitor of Kelly Services within the market area that she served while employed by Kelly Services.  See Verified Compl., Ex. A.  The questions are whether the non-compete clause is enforceable against Greene; and if so, whether Greene breached its terms.

Michigan law allows enforcement of non-compete clauses pursuant to statute:

> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business.  To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

Mich. Comp. Laws Ann. § 445.774a (West 2008).  The enforceability of a non-compete agreement under the Michigan statute depends on whether: (1) it "is reasonably drawn as to its duration, geographical scope, and line of business; and (2) it protects the legitimate business interest of the party seeking its enforcement."  Kelly Servs., Inc. v. Noretto, 495 F. Supp.2d 645, 657 (E.D. Mich. 2007).

In two separate cases, federal courts in Michigan recently enforced non-compete clauses by Kelly Services identical to the one here.  See Kelly Servs.,

Inc. v. Eidnes, 2008 WL 115187, ___ F. Supp.2d ___ (E.D. Mich. 2008); Noretto, 495 F. Supp.2d 645.  In both Eidnes and Noretto a former high-level Kelly Services employee accepted a comparable position with a competitor in the same market area.  The non-compete clauses were reasonably limited temporally to one year and geographically to the market areas served by the employee during the last five years of employment with Kelly Services.  Eidnes, 2008 WL 115187 at *7; Noretto, 495 F. Supp.2d at 657.  The non-compete clauses were found enforceable because "Kelly [Services] has a legitimate business interest in restricting its former employee from soliciting its customers and in protecting confidential and proprietary information such as customer lists, profit margins, corporate strategies, and pricing schemes." Noretto, 495 F. Supp.2d at 657; see Eidnes, 2008 WL 115187 at *7.

Even though those two cases enforced identical non-compete clauses, that does not necessarily determine the enforceability of the clause as it applies to Greene.  Whether the scope of Greene's non-compete clause is reasonable must be analyzed not in the abstract, but rather in the specific context of Kelly Services' legitimate business interests and Greene's particular knowledge and function.  See Whirlpool Corp. v. Burns, 457 F. Supp.2d 806, 812 (W.D. Mich. 2006).

Greene does not challenge the reasonableness of the temporal or geographic limitations in her non-compete clause.  Rather Greene distinguishes her case from Eidnes and Noretto by arguing that Kelly Services has no legitimate interest in preventing her from performing strictly clerical

duties for a competitor. Greene argues the non-compete clause should be ruled unenforceable here, because it is overly broad, prohibiting her from working in the staffing industry in any capacity. See Def.'s Opp'n at 11–12.

Under Michigan law, "[a] covenant not to compete may not be read to extend beyond an employer's reasonable competitive business interests." Whirlpool Corp., 457 F. Supp.2d at 812 (internal quotation marks omitted). Thus, a non-compete agreement may be overly broad if it prohibits an employee from working for a competitor in any capacity. See Ram Prod. Co., Inc. v. Chauncey, 967 F. Supp. 1071, 1092 (N.D. Ind. 1997) (applying Michigan law and concluding that a non-compete clause was unreasonable because it prevented a former employee from working "for any business in any capacity if the business competes with [the former employer]"); Superior Consultant Co., Inc. v. Walling, 851 F. Supp. 839, 847 (E.D. Mich. 1994) ("A limitation on working in any capacity for a competitor of a former employer is too broad to be enforceable."); Robert Half Int'l, Inc. v. Van Steenis, 784 F. Supp. 1263, 1273 (E.D. Mich. 1991).

Greene worked at Kelly Services for approximately two years as a Staffing Supervisor. In that capacity Greene had direct contact with clients and candidates, along with access to a wide array of confidential information. Therefore, Kelly Services has a legitimate interest in preventing Greene from soliciting clients or recruiting candidates in competition with Kelly Services. But the Portland office of Maine Staffing primarily targets clients in different industries than Kelly Services. Greene does not solicit clients in her current

9

position at Maine Staffing.  And Greene does not participate in any recruiting of white collar or clerical personnel, which was the market she served while employed by Kelly Services.[6]  It is difficult, therefore, to identify any legitimate business interest that Kelly Services has in preventing Greene from working for Maine Staffing in a clerical/administrative role where she does not solicit any clients or recruit candidates in competition with Kelly Services.[7]  See generally Follmer, Rudzewicz & Co. v. Kosco, 362 N.W. 2d 676, 680 n.4 (Mich. 1984) ("It has been uniformly held that general knowledge, skill, or facility acquired through training or experience while working for an employer appertain exclusively to the employee.") (quoting Harlan M. Blake, Employee Agreements Not To Compete, 73 Harv. L. Rev. 625, 652 (1960)).

I conclude that Kelly Services has not shown sufficient likelihood that the non-compete clause will be enforceable against Greene.

---

[6] Kelly Services apparently believes that Greene's responsibilities at Maine Staffing are much more than primarily clerical.  But the evidence Kelly Services submitted—Greene's title as "Staffing Specialist" and the listing of Greene's name, number, and e-mail under "Contact Info" in Maine Staffing's job advertisements, see Miller Aff., Exs. C, G, H—is not necessarily inconsistent with the direct statements of Greene and Mark Burns that she has a limited function at Maine Staffing.  See Greene Aff. ¶ 25; Burns Aff. ¶ 5.

[7] Greene also argues that she did not breach the agreement (if it is enforceable) because Maine Staffing should not be considered a "competitor"—as the term is used in the agreement—of Kelly Services in the relevant market area.  The Portland office of Maine Staffing and Kelly Services appear to serve clients in and recruit employees for different and distinct industries.  But although the Portland office of Maine Staffing and Kelly Services may serve different categories of "clients," they apparently compete for some similar "candidates."  See Miller Aff. ¶ 18 & Exs. A–F.  Moreover, Kelly Services provides at least one example where it directly competed for a "client" with Maine Staffing.  See Miller Aff. ¶ 15.

And in regard to potential future competition, there do not appear to be any significant barriers preventing either company from serving the other's clients.  Greene refers to her understanding that Kelly Services does not serve blue collar industries because of its insurance liability policy.  Greene Aff. ¶ 26.  This would not preclude Maine Staffing from trying to compete against Kelly Services for business from financial and insurance companies or Kelly Services from obtaining the necessary qualifications to compete for clients in blue collar industries.

*(b) Breach of Confidentiality Clause*

The confidentiality clause states that Greene will "never disclose, use, copy, or retain any confidential business information or trade secrets belonging to Kelly, Kelly's customers, or Kelly's suppliers." Verified Compl., Ex. A. Kelly Services has presented no evidence that Greene has actually used any of its trade secrets or confidential business information during her employment with Maine Staffing. It has information only about her computer activity while still at Kelly Services (specifically, the transfer of files to a USB drive). See Miller Aff. ¶ 27 & Ex. L. But its conclusion that Greene took the USB drive to Maine Staffing and used it improperly is pure speculation. It is directly contradicted by Greene's own sworn statements that she did not retain any protected information from Kelly Services. See Greene Aff. ¶ 28.[8]

Kelly Services has not shown a likelihood of success on its claim that Greene breached the confidentiality clause.

*(c) Violation of Michigan Uniform Trade Secrets Act*

The Michigan Uniform Trade Secrets Act, Mich. Comp. Laws Ann. § 445.1901 et seq. (West 2008), allows for an injunction against "[a]ctual or threatened misappropriation" of a trade secret. Id. § 445.1903(1). It defines "misappropriation":

---

[8] The allegation that Greene retained protected information on a USB drive from Kelly Services is supported by an "IT Security Forensics Analysis Report" that purports to trace Greene's computer activity. See Miller Aff. ¶ 27, Ex. L. This report is ambiguous at best; it shows that in the days just before Greene left Kelly Services on December 7, 2007, the only files accessed were her personal files (the files potentially containing confidential client information do not appear to have been accessed for weeks previously). See id. The forensics report is the only basis for Kelly Services' allegations that Greene breached the confidentiality clause. Alone, it does not satisfy the likelihood of success standard.

"Misappropriation" means either of the following:

(i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did [one] or more of the following:

(A) Used improper means to acquire knowledge of the trade secret.

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Id. § 445.1902(b). A "trade secret" exists under the MUTSA if the "information derive[s] independent economic value from not being generally known to others; and . . . the employer [took] reasonable steps to protect the confidentiality of the information." Eidnes, 2008 WL 115187 at *7; Mich. Comp. Laws Ann. § 445.1902(d). An employer's "pricing schemes, the details of its customer contacts, its markups, [and] employee information" are examples of possible "trade secrets" under the MUTSA. See Eidnes, 2008 WL 115187 at *8. I assume that Greene had access to Kelly Services' trade secrets.

As stated in the preceding section, however, Kelly Services fails to allege any actual misappropriation by Greene. Instead, Kelly Services claims "threatened" misappropriation under the inevitable disclosure theory. See Pl.'s Mem. at 16–18. Kelly Services relies upon a Seventh Circuit case interpreting

Illinois law for this inevitable disclosure theory. <u>Id</u>. at 16 (citing <u>Pepsico, Inc. v.</u> <u>Redmond</u>, 54 F.3d 1262 (7th Cir. 1995)). Under the inevitable disclosure theory, "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that the defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." <u>Pepsico</u>, 54 F.3d at 1269.

Kelly Services does not cite any Michigan case adopting the inevitable disclosure theory and does not mention that subsequent to the Seventh Circuit's decision in <u>Pepsico</u>, two Michigan courts have limited the inevitable disclosure theory under the MUTSA. In <u>CMI Int'l, Inc. v. Intermet Int'l Corp.</u>, a Michigan appellate court considered <u>Pepsico</u> under the MUTSA and concluded: "for a party to make a claim of threatened misappropriation, whether under a theory of inevitable disclosure or otherwise, the party must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets." 649 N.W.2d 808, 813 (Mich. App. 2002) (suggesting the need for evidence of duplicity beyond simply employment by a competitor). Most recently, a federal court in Michigan shed an even more skeptical light on the inevitable disclosure theory under the MUTSA: the inevitable disclosure "doctrine has never been adopted in Michigan and, even where it has been discussed, it has only been suggested to be applicable to high executives and key designers of the company's strategic plans and operations." <u>Degussa Admixtures, Inc. v. Burnett</u>, 471 F. Supp.2d 848, 856 (W.D. Mich. 2007).

Given that Greene was a fairly junior employee at Kelly Services (and currently serves in a clerical role at Maine Staffing), and Kelly Services' failure to allege any specific acts of actual or threatened misappropriation, I conclude that Kelly Services has not shown a likelihood of success on its MUTSA claim.

**(2)      *Irreparable Harm***

Kelly Services argues that Greene should be enjoined because otherwise it could suffer irreparable harm through the loss of "clients and customers, confidential, proprietary and trade secret information, the goodwill and referral business of its clients and customers, and revenues in an amount that cannot be readily ascertained."  Pl.'s Mem. at 8.

Irreparable harm exists when legal remedies (i.e., monetary damages) are inadequate.  Weinberger v. Romero-Barcleo, 456 U.S. 305, 312 (1982); Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18–19 (1st Cir. 1996). The disclosure or use of confidential information may cause irreparable harm. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop, 839 F. Supp. 68, 71–72 (D. Me. 1993).  The loss of business goodwill and reputation in certain circumstances also can be a form of irreparable harm due to the difficulty of calculating any monetary damages.  See Ross-Simons of Warwick, Inc., 102 F.3d at 20.

Not just any claim of potential loss of confidential information, goodwill, or reputation satisfies the standard for irreparable harm.  The claim must have some substance; the alleged irreparable harm must be more than speculative. See Matrix Group Ltd., Inc. v. Rawlings Sporting Goods Co., Inc., 378 F.3d 29,

14

34 (1st Cir. 2004); <u>Ross-Simons of Warwick, Inc.</u>, 102 F.3d at 19; <u>Everett J. Prescott, Inc. v. Ross</u>, 383 F. Supp.2d 180, 191-92 (D. Me. 2005) (citing <u>Bishop</u>, 839 F. Supp. at 74–75).

Kelly Services' claim of irreparable injury is merely speculative. The sweeping allegations in the Verified Complaint that Greene took and disclosed protected information are unsupported by personal knowledge or other facts. Kelly Services provides no evidence that Greene has attempted to contact any of its clients or candidates. <u>See</u> <u>Everett J. Prescott, Inc.</u>, 383 F. Supp.2d at 191-92 (relying on evidence the former employee actually solicited and sold to his former employer's customers to move beyond mere speculative irreparable harm).[9] Kelly Services' claim that it will suffer irreparable harm simply as a result of Greene working for Maine Staffing is also unpersuasive. The affidavits submitted by Greene and Mark Burns show that Greene can be employed by Maine Staffing without disclosing or using any protected information of Kelly Services. <u>See</u> <u>Wausau Mosinee Paper Corp. v. Magda</u>, 366 F.2d 212, 222–23 (D Me. 2005) (concluding that the continuing applicability of a confidentiality

---

[9] Kelly Services relies exclusively on cases outside the First Circuit where the irreparable harm identified was less speculative because of either specific actions already taken by the former employee or the similarity between the former employee's prior and current employment responsibilities. <u>See</u>, <u>e.g.</u>, <u>Noretto</u>, 495 F. Supp.2d at 649 (a twenty-one year veteran of the staffing industry, who served as Regional Manager for the Major Markets Division of Kelly Services in Portland, Oregon, went to work for a direct competitor of Kelly Services and evidence showed the former employee "was possibly soliciting his former clients"); <u>Lowry Computer Products, Inc. v. Head</u>, 984 F. Supp. 1111, 1112, 1116 (E.D. Mich. 1997) (a former salesperson went to work for a direct competitor selling a similar product); <u>Superior Consulting</u>, 851 F. Supp. at 847 (a former employee accepted a job with a competitor to perform an identical function, providing healthcare information systems consulting services). <u>Chem-Trend Inc. v. McCarthy</u>, 780 F. Supp. 458, 461–62 (E.D. Mich. 1991) (the former employee started a business in direct competition with his former employer and actually solicited and made sales to his former employer's clients).

agreement with a former employer was sufficient to prevent irreparable harm pending final disposition).

Kelly Services has not met its burden to show a cognizable threat of irreparable harm.

**(3)     *Balance of Harms and***
**(4)     *Public Interest***

The likelihood of success and irreparable harm are each prerequisites to a preliminary injunction.  The movant's failure to carry its burden on either is sufficient to justify denying a motion for a preliminary injunction.  Since Kelly Services has failed on both, I need not address the two remaining factors.

CONCLUSION

The motion for a preliminary injunction is **DENIED.**

**SO ORDERED.**

**DATED THIS 28TH DAY OF FEBRUARY, 2008**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**